UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANTONIA PALERMO,            CASE NO. 6:15-cv-1375-Orl-37DAB

    Plaintiff,

vs.

GRUNAU COMPANY, INC.,

    Defendant.
_____/

## PLAINTIFF PALERMO'S MEMORANDUM IN OPPOSITION TO DEFENDANT GRUNAU'S MOTION FOR SUMMARY JUDGMENT

Plaintiff ANTONIA PALERMO opposes Defendant GRUNAU COMPANY's Motion for Summary Judgment, and in response submits this Memorandum, the deposition of Corporate Representative Mark Peters (with exhibits), and the Declaration of Rebecca M. "Becky" Smith. We demonstrate below that PALERMO has established a *prima facie* case of discrimination, and that disputed issues of material fact exist as to whether GRUNAU's explanation for PALERMO's termination (alleged layoff for lack of work) is pretextual (Counts I, II and III). We also demonstrate that PALERMO has sufficiently established a "causal connection" between her protected activity (filing a FCHR/EEOC complaint) and GRUNAU's failure to rehire her (Count IV).

### I.    PALERMO HAS ESTABLISHED A *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION

GRUNAU correctly states that the test for establishing a *prima facie* case of disability discrimination is: (a) that the plaintiff has a disability; (b) is a qualified individual; and (3) was subjected to unlawful discrimination because of her disability. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014), citing *Holly v. Clairson Indus., LLC*, 492 F.3d

1247, 1255 – 56 (11th Cir. 2007). GRUNAU does not contest the first two prongs. GRUNAU claims only that PALERMO cannot establish a *prima facie* case because she cannot show that a non-disabled person was treated more favorably, under a "reduction in force" ["RIF"] analysis. (GRUNAU Memo, Doc. 50 at p. 8). In response, PALERMO contends that the RIF test is not appropriate because she was replaced; but even if it were, she has met her burden of producing sufficient evidence of discriminatory intent.

### A. PALERMO HAS STATED A *PRIMA FACIE* CASE UNDER THE TRADITIONAL MCDONNELL-DOUGLAS TEST

The "RIF" test is not the appropriate test because PALERMO was replaced by James Wells, who was hired to assume her duties while she was on medical leave because of her stroke. The difference between the traditional, now-familiar *McDonnell-Douglas* test and the "RIF" test for establishing a *prima facie* case is that an employee who is terminated in a reduction in force is generally unable to prove that she was replaced by someone outside the protected class. *Mazzeo, supra,* 743 F.3d at 1271. Under the RIF test it is necessary for the plaintiff to produce sufficient evidence from which a reasonable jury could conclude that the employer intended to discriminate on a prohibited basis through its employment decision. (*Id.*, citing *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). PALERMO contends that the traditional test should be used because she was replaced.

It is undisputed that PALERMO's position was "Fire Systems Inspector", and that she worked from GRUNAU's Orlando office (GRUNAU Memo, Doc. 50, p. 2). It is also undisputed that PALERMO was on leave because of her stroke from March 28, 2011 to July 26, 2011 (having obtained a complete medical release without restrictions on July 20, 2011 (*Id.*); and that when she returned to work she was assigned to work from GRUNAU's Fort Myers office, the stated reason being lack of work in Orlando. Finally, it is undisputed that PALERMO

2

worked in Fort Myers for one week (August 1-5, 2011) before being notified of her termination on August 8, 2011 (*Id.*, p. 3).

There can be no serious dispute that James Wells was hired to replace PALERMO, which resulted in the alleged "lack of work" in Orlando. At the time PALERMO was terminated GRUNAU employed three Fire Systems Inspectors: PALERMO, Rebecca Smith, and James Wells. (Peters corporate rep. depo [hereinafter "Peters depo"] Doc. 54, p. 57-58). Persons holding that position are therefore the appropriate comparator pool. All Fire Systems Inspectors worked out of the Orlando office and were supervised by Ken Cross, who worked in the Orlando office (Declaration of Rebecca M. "Becky" Smith [hereinafter "Smith Decl."], Doc. 53, para. 3; Peters depo p. 49). GRUNAU's records disclose that Wells was hired on May 28, 2011 – less than two months before PALERMO was completely released to return to work. (Peters depo, Ex. 2, p. 0095).[1] When Wells was hired there was no shortage of work (Peters depo., p. 56). Wells was assigned to the same general territory PALERMO had been, *i.e.*, the Orlando area and the east coast of Florida (Smith Decl. para. 6, 7). When PALERMO returned to work she was told by Cross that the reason why no work was available in Orlando was because GRUNAU had hired someone else to replace her. (PALERMO depo, p. 35-36).

When PALERMO asked why she was being laid off when Wells had less time with GRUNAU, she did not receive a reply (PALERMO depo, p. 42-43). Peters was unable to explain whether any consideration was given to laying off Wells instead of PALERMO (Peters depo, p. 56); and his only explanation why the most recently-hired inspector was retained while PALERMO was terminated was that there was no policy which required GRUNAU to retain more senior employees (Peters depo, p. 58). Hence, not only does PALERMO state a *prima*

---

[1] Wells is incorrectly listed as having a "Sales" position (Peters depo, p. 36-37).

3

*facie* case; but in addition GRUNAU has failed to assert a legitimate nondiscriminatory reason for its decisions.

Demonstrating a *prima facie* case is not onerous: it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The facts that PALERMO was replaced while on medical leave, and that her replacement was neither assigned to the Fort Myers office nor terminated, are sufficient to establish a *prima facie* case under the traditional *McDonnell-Douglas* termination framework; therefore it is that test, rather than the RIF test, which should be used by the Court on summary judgment. (*Mazzeo, supra,* 746 F.3d at 1270-1271). PALERMO has shown that Wells, a non-disabled employee having similar or lesser qualifications, was treated more favorably than she was. That, when coupled with the fact that Wells had been hired to replace PALERMO and was given her former territory, under circumstances where GRUNAU's corporate representative was unable to explain whether any consideration was given to terminating Wells rather than PALERMO (or, if not, why not) is sufficient to create the required inference of discrimination.

### B. PALERMO HAS STATED A *PRIMA FACIE* CASE UNDER THE RIF TEST

Even if the RIF test is used (improperly, we contend), nevertheless PALERMO has provided a superabundance of evidence of discriminatory animus by her supervisor, Cross, who was directly involved in the employment decisions at issue in this case (Peters depo, p. 71-72). Cross repeatedly remarked during PALERMO's absence that PALERMO was never coming back to work; that she could never get a complete medical release; that if she tried to work she would only have another stroke and be out again; and that she couldn't drive because she might have another stroke (Smith Decl., para. 7). And, after PALERMO (undisputedly, see GRUNAU Memo, Doc. 50, p. 4) submitted an employment application for her former position in response

to a posted vacancy announcement within days of her termination, Cross stated that PALERMO was stupid to think that GRUNAU would rehire her, when she had been fired because she had a stroke and it was only a matter of time before she had another one (Smith Decl., para. 9). This evidence (including direct evidence shifting the burden of proof at trial to GRUNAU), particularly when coupled with the additional facts that Wells was hired to replace PALERMO and was given her territory, establish an extremely powerful inference that GRUNAU's motive for transferring PALERMO, rather than Wells, to Fort Myers and for terminating PALERMO, rather than Wells, a week later was that GRUNAU feared PALERMO would have another stroke if she continued to work.

For the above reasons, PALERMO has stated a *prima facie* case under both the *McDonnell-Douglas* test and the RIF test.

## II. DISPUTED ISSUES OF FACT EXIST REGARDING WHETHER GRUNAU'S STATED REASON FOR TERMINATING PALERMO IS FALSE AND PRETEXTUAL

For its legitimate nondiscriminatory explanation, GRUNAU asserts that when PALERMO returned to work from medical leave there was a shortage of work in Orlando, but it believed work was available in Fort Myers; that PALERMO (undisputedly) worked in Fort Myers for one week, between August 1 and 5, 2011; that sometime during that one-week period GRUNAU suddenly discovered that work in Fort Myers was not available; and that it terminated PALERMO due to the sudden shortage of work in Fort Myers. In addition to the evidence of Cross's animus discussed above, there are a plethora of disputed facts which demonstrate that GRUNAU's explanations are false and pretextual.

First, Smith testified that when PALERMO returned there was no shortage of work in Orlando; and that in fact after PALERMO was terminated union employees who performed

5

inspections on construction projects (as opposed to the non-construction inspections performed by PALERMO, Wells and Smith as non-union "Fire Systems Inspectors") had to help cover the workload. (Smith Decl., para. 8). This indicates that GRUNAU's stated reason for assigning PALERMO to Fort Myers is false.

Second, Smith testified that she had volunteered to perform Fort Myers inspections and that she preferred them to Orlando inspections. (*Id.*). This raises the question why Smith was not (and/or could not have been) assigned to perform the inspections in Fort Myers, while PALERMO performed the Orlando inspections which Smith performed.

Third, Smith testified that when PALERMO was assigned to Fort Myers it was already common knowledge that GRUNAU was considering closing that office, and had been laying off workers in that area. (*Id.*). That disputes Peters' deposition testimony that GRUNAU "believed" that sufficient work existed in Fort Myers when it assigned PALERMO to work from that office, and that GRUNAU did not already know that such assignment would only be temporary (Peters depo., p. 51). Smith's testimony is bolstered by the list of employees allegedly terminated from the Fort Myers office attached to Peters' declaration (Doc. 47)(hereinafter "Peters Decl."): only *four* of them were terminated *after* PALERMO was (August 8, 2011).

Fourth, Peters testified in his declaration that the shortage of work which prompted the decision to assign PALERMO to Fort Myers was due, in large part, to the fact that *during PALERMO's medical leave* GRUNAU's largest customer (Walgreens), had accelerated its inspection schedule so that all inspections had to be performed by August 31 rather than November 1 (Peters Decl., para. 12). In his corporate representative deposition Peters testified, inconsistently, that GRUNAU was notified of the accelerated schedule at the beginning of the year (Smith depo., p. 57). Both assertions are disputed by Smith, who testified that she was

6

never told that the schedule had been accelerated, and that she continued to perform Walgreens inspections until November, 2011 as was normal (Smith Decl., para. 10).

Fifth, Peters was unable to explain what (allegedly) happened during the week PALERMO worked in Fort Myers (August 1 – 5) which resulted in the decision to terminate her for alleged lack of work on the following Monday (August 8). In his declaration Peters states that "A week after Ms. Palermo began work [in Fort Myers], GRUNAU *unexpectedly* learned that the workload in the Fort Myers office was about to significantly decrease as well." (Peters Decl., para. 19). However, in his deposition, Peters testified:

"Q. What happened during that week which caused you to terminate Ms. Palermo?

A. I don't recall.

Q. Well, can you tell us, then, why you terminated Ms. Palermo?

A. Lack of work.

Q. When did the lack of work become apparent?

A. August 8th.

Q. And what lack of work became apparent as of that date that was not apparent previously?

A. We continued to decline in work after – after that date.

Q. After what date?

A. August 5th.

Q. Well, August 6 and 7, I will tell you, is a weekend, Saturday and Sunday.

A. Mm-hmm.

Q. So what happened over that weekend?

A. I don't recall." (Peters depo, p. 53-54)

An employer's lack of credibility is evidence of pretext; and dishonesty can be affirmative evidence of guilt, which a jury may infer. *Cleveland v. Home Shopping Network,*

7

*Inc.*, 369 F.3d 1189, 1194-95 (11th Cir. 2004)(citing *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 148-151 (2000). GRUNAU's inability to point to any specific "*unexpected*" change in workload which occurred *after* PALERMO was assigned to Fort Myers obviously raises the inferences that Peters' testimony in that area is false and pretextual; that GRUNAU knew that it was going to terminate PALERMO when it assigned her to Fort Myers; and that GRUNAU's assertion that it terminated PALERMO because of a shortage of work *in Fort Myers* is a mere pretext for discrimination.

Sixth, PALERMO testified, and Smith confirmed, that PALERMO was instructed to use her own personal vehicle to drive to, and work in, Fort Myers, whereas previously all Fire Systems Inspectors (including PALERMO) had been assigned company vehicles. (PALERMO depo, p. 91; Smith Decl., para. 8). Not only does that dispute Peters' declaration testimony (Peters Decl., para. 17); but in addition it raises inferences that (a) GRUNAU had already decided to fire PALERMO when it assigned her to Fort Myers, so it was not necessary to assign her a company vehicle; (b) GRUNAU was afraid that PALERMO would have another stroke creating liability for GRUNAU if she drove a company vehicle; and (c) Peters' testimony that an *unexpected* shortage of work occurred while PALERMO was in Fort Myers is unworthy of credence.

From all of the above, when construed in a light most favorable to PALERMO (as required on summary judgment), a reasonable jury could find and conclude (as Smith concluded, see Smith Decl., para. 8), that GRUNAU neither expected, nor wanted, PALERMO to return to work after her medical leave; that GRUNAU deliberately (and unnecessarily) assigned PALERMO to the Fort Myers office in the hope that she would quit; and that such assignment, made with GRUNAU's foreknowledge that it would soon close the Fort Myers office, was used

to provide "cover" for its real reason for terminating PALERMO; *i.e.*, that GRUNAU was fearful that PALERMO would have another stroke if she continued to work, and was considered undesirable for continued employment for that reason.

Denial of GRUNAU's motion for summary judgment regarding Counts I, II and III is therefore warranted, and is required.

### III. PALERMO HAS STATED A CLAIM FOR RETALIATORY REFUSAL TO REHIRE

In Count IV PALERMO has alleged that she was not rehired in retaliation for pursuing her FCHR/EEOC complaint. While conceding that PALERMO's complaint is protected activity, GRUNAU moves for summary judgment on the grounds that PALERMO did not suffer an "adverse employment action"; that she cannot establish a causal connection; i.e., that the two events are "not wholly unrelated"; and that PALERMO cannot refute GRUNAU's nondiscriminatory explanation. GRUNAU is incorrect.

#### A. GRUNAU'S FAILURE TO REHIRE PALERMO IS AN "ADVERSE EMPLOYMENT ACTION"

GRUNAU's contention that a "failure to rehire" is not an "adverse employment action" is easily disposed of. The Eleventh Circuit has held that "An employer's failure to recall or rehire an employee is '*undoubtedly* an adverse employment action' where the employee reapplied for the position after termination." *Jones v. Alabama Power Company*, 282 Fed. Appx. 780, 785 (11th Cir. 2008)(citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1135, 1141 (5th Cir. 1981))(emphasis supplied). See also *Olmsted v. Defosset*, 205 F.Supp. 2d 1316, 1321 (M.D. Fla. 2002). GRUNAU concedes that PALERMO reapplied for her former position on August 10, 2011 in response to a posted job vacancy announcement (GRUNAU Memo, Doc. 50, p. 4. See also Peters depo, Ex. 4); that PALERMO filed her EEOC/FCHR charge on October

9

4, 2011 (GRUNAU Memo, Doc. 50 p. 4); and that at no time after PALERMO reapplied for her position did GRUNAU contact, interview, recall or rehire PALERMO (GRUNAU Memo, Doc. 50 p. 11). Accordingly, GRUNAU's failure to rehire PALERMO is an "adverse employment action" for which a retaliation claim may lie.

### B. PALERMO HAS PRODUCED EVIDENCE OF A CAUSAL CONNECTION BETWEEN HER DISCRIMINATION COMPLAINT AND GRUNAU'S FAILURE TO REHIRE HER, WHICH IS SUFFICIENT TO REFUTE GRUNAU'S ALLEGED LEGITIMATE REASON

GRUNAU contends that PALERMO cannot establish a causal connection between her EEOC/FCHR complaint (of which GRUNAU learned in October, 2011) and GRUNAU's failure to rehire her because GRUNAU did not hire anyone for PALERMO's position until October 8, 2012, a year later. (GRUNAU Memo, Doc. 50 p. 12). GRUNAU contends that such lengthy lapse of time between charge-filing and hiring decision is insufficient to establish a causal connection based on temporal proximity. (*Id.*). While at first blush this argument may appear beguiling, under the circumstances of this case (set forth below) it is unavailing.

PALERMO concedes that the *apparent* lack of temporal proximity, standing alone, would be insufficient to establish a causal connection; but the inquiry does not end there. In this case, GRUNAU has *conceded* that it *routinely* posts job vacancy advertisements *regardless* of whether a position is available at the time, for the purpose of "accepting year round applications for employment to keep on hand." (Peters Decl., para. 22). As GRUNAU correctly notes, the essence of a "failure to rehire" claim is the employer's refusal to rehire the employee *when positions are available*; and it does not exist *until* a position becomes available (which lack of availability is GRUNAU's asserted nondiscriminatory reason). The first time PALERMO's position became available was in October, 2012; and it was *then* when GRUNAU should have, but did not, consider PALERMO for rehire based on the applications it "kept on hand". That

begs the question of why it did not do so.

In his corporate representative deposition Peters was questioned about GRUNAU's reasons for failing to rehire PALERMO. There were none. Peters admitted that PALERMO's application was kept on file (Peters depo, p. 64); that he made no effort to find out why, if GRUNAU had no position available, it continued to advertise for that position (*Id.*, p. 67); that he knew of no reason why PALERMO should not have been considered for the position when it became available (*Id.*); and that there was no reason why PALERMO would have been disqualified for that position (*Id.*, p. 68). Because GRUNAU concededly kept applications on file until they were needed to fill a vacancy, and because there was no reason why PALERMO's application should not have been considered when a vacancy occurred, the temporal gap between PALERMO's EEOC/FCHR charge, her job application, and GRUNAU's subsequent hire of another employee has been closed, and GRUNAU's asserted nondiscriminatory explanation rendered nonexistent, allowing the jury to infer a prohibited reason (*Cleveland, supra*).

Additionally, GRUNAU concedes that PALERMO's charge of discrimination was disposed of on September 28, 2012 (GRUNAU Memo, Doc. 50 p. 4), and that GRUNAU hired a Fire Systems Inspector less than two weeks later, on October 8, 2012 (*Id.*, p. 12). This begs the questions of whether GRUNAU intentionally waited to hire another Fire Systems Inspector until the EEOC investigation had been concluded, and whether its failure to rehire her two weeks later (when there was no reason not to do so) was based on retaliation for her EEOC/FCHR complaint. Under remarkably similar circumstances, former Middle District Chief Judge Kovachevich concluded that the "causal connection" element of a "failure to rehire" retaliation claim was satisfied where the employee had been discharged; his lawsuit alleging that his termination was discriminatory had been dismissed; he reapplied for available work with the

employer; and he was not rehired (*Olmsted, supra*). Judge Kovachevich specifically concluded that that combination of circumstances, commencing when the employee's lawsuit was *concluded* (rather than filed), showed "close temporal proximity" between the protected activity and the adverse employment action, and that the plaintiff had therefore stated a *prima facie* case of retaliation. (*Olmsted*, 205 F.Supp.2d at 1321-1322). The same result is required here, where GRUNAU kept employment applications on file until they were needed, as they were less than two weeks after PALERMO's discrimination complaint was dismissed.

GRUNAU's motion for summary judgment should accordingly be denied.

## CONCLUSION

For the foregoing reasons, GRUNAU's motion for summary judgment should be denied in its entirety.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 23rd day of August, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System which will send a notice of electronic filing to Amy S. Tingley, Esquire atingley@sctlaw.com and J. Scott Hudson, Esquire shudson@sctlaw.com, The VUE at Lake Eola, 220 North Rosalind Avenue, Orlando, FL 32801.

THOMAS J. PILACEK & ASSOCIATES
Winter Springs Town Center
158 Tuskawilla Road, Suite 2320
Winter Springs, FL 32708
Telephone: (407) 660-9595
Facsimile: (407) 660-8343
E-mail: Primary: tpilacek@pilacek.com
Secondary: dbrock@pilacek.com
gdavis@pilacek.com
BY: _____
Thomas J. Pilacek
Fla. Bar No. 143576

Counsel for Plaintiff