## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ANTONIA PALERMO,

        Plaintiff,

v.                                                                          Case No. 6:15-cv-1375-Orl-37DCI

GRUNAU COMPANY, INC.,

        Defendant.

_____

## ORDER

This cause is before the Court on the following:

1.  Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 50), filed July 29, 2016; and

2.  Plaintiff Palermo's Memorandum in Opposition to Defendant Grunau's Motion for Summary Judgment (Doc. 55), filed August 23, 2016.

## BACKGROUND

Defendant Grunau Company, Inc. ("**Grunau**") is a mechanical systems and fire protection company that provides, *inter alia*, fire protection services to commercial and industrial projects. (Doc. 50, p. 2.) From about January 22, 2010, until August 8, 2011, Grunau employed Plaintiff Antonia Palermo ("**Palermo**") as a fire systems inspector ("**Inspector**"). (Doc. 2, ¶ 5; *see also* Doc. 49-1, p. 25.) Though based out of Grunau's Orlando office, Palermo traveled to customer locations in a company car throughout central Florida and as far north as Jacksonville to inspect on customers' fire suppression systems. (Doc. 50, p. 2; *see also* Doc. 2, ¶ 5; Doc. 49-1, pp. 25, 91.)

While so employed, Palermo suffered a stroke and was placed on medical leave

on March 29, 2011. (Doc. 2, ¶ 6.) On May 16, 2011, Grunau hired James Wells ("**Wells**") in the Orlando Office as an Inspector. (Doc. 54-1, pp. 36–37.) Wells covered the eastern territory of Florida, extending from Jacksonville to St. Lucie County—the territory previously covered by Palermo. (*Id.* at p. 58; *see also* Doc. 53-1, ¶ 7.) Wells joined former employee Rebecca Smith ("**Smith**"), who was also an Inspector, covering the west coast of Florida and the Orlando area. (Doc. 53-1, ¶ 6.) Smith, Wells and Palermo all reported to Ken Cross ("**Cross**") in the Orlando office. (*See* Doc. 53-1, p. 1; *see also* Doc. 49-1, p. 51.)

On July 26, 2011, Palermo returned to work without restrictions after receiving approval from her doctor. (Doc. 2, ¶ 8.) Upon her return, Cross and Mark Peters ("**Peters**"), vice president of Grunau's Florida division, informed Palermo that the Orlando office had experienced a shortage of work in her absence. (Doc. 2, ¶ 9; *see also* Doc. 49-1, p. 35.) Peters attributed this shortage to: (1) Walgreens, Grunau's largest client, accelerating its deadline for completing inspections from November 1, 2011, to August 31, 2011; and (2) a general decrease in overall business. (Doc. 47-1, ¶¶ 12–13.) As such, Peters directed Palermo to report to the Fort Myers office where work was available. (Doc. 2, ¶ 9; *see also* Doc. 47-1, ¶ 15.)

Palermo began work in the Fort Myers office on August 1, 2011. (Doc. 2, ¶¶ 11–12.) She performed her inspections as she had done before but did so in her personal vehicle rather than a company car. (Doc. 49-1, p. 91.) A week later—on August 8, 2011—Grunau terminated Palermo citing lack of work in the Fort Myers office. (Doc. 2, ¶¶ 11–12; *see also* Doc. 50, p. 3; Doc. 49-1 p. 40.) According to Peters, Grunau "unexpectedly learned that the workload in the Fort Myers office was about to significantly decrease as

well" and, as a result, Grunau downsized its workforce. (Doc. 47-1, ¶ 19.) Consequently, Grunau terminated twenty-seven employees—including Palermo—and closed the Fort Myers office. (Doc. 47-1, ¶ 20; *see also* Doc. 47-1, p. 6.)

On August 1, 2011, Grunau posted an Inspector vacancy. (Doc. 2, ¶¶ 16–17.) Following her August 8, 2011 termination, Palermo applied for the Inspector vacancy on August 10, 2011. (*Id.*) Grunau never contacted Palermo about the vacancy and did not hire another Inspector until more than a year after Palermo's termination on **August 15, 2012**. (Doc. 47-1, ¶¶ 23, 24.) Such position, however, was based out of south Florida. (Doc. 47-1, ¶ 24.) Grunau did not hire another Inspector in the Orlando office until **October 8, 2012**. (*Id.* ¶ 25.)

On August 12, 2011, Palermo filed a charge with the Florida Commission on Human Relations ("**FCHR**"), contending that her termination on August 8, 2011, violated the Americans with Disability Act ("**ADA Charge**"). (Doc. 2, ¶ 21.) The FCHR assigned the ADA Charge to Equal Employment Opportunity Commission ("**EEOC**") for investigation. (*Id.*) Subsequently, on **October 4, 2011**, Grunau received notice of the ADA Charge. (*See* Doc. 47-1, ¶ 26.) The EEOC dismissed the ADA Charge on September 28, 2012. (*Id.*)

Palermo then filed a four-count Complaint against Grunau in state court alleging claims of disability discrimination and retaliation under the Florida Civil Rights Act ("**FCRA**"). (Doc. 2.) Based on diversity jurisdiction, Defendant removed the instant action to this Court. (Doc. 1.) Subsequently, Grunau moved for summary judgment (Doc. 50), and Palermo responded (Doc. 55, p. 5). The matter is now ripe for adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the nonmoving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents*,

468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## DISCUSSION

### I.     Discrimination Claims

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that he: (1) is disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of his disability.[1] *Holly v. Clarison Indus., L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007). Generally, where a plaintiff offers circumstantial evidence to prove discrimination, courts use the burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93, (1973). *See Durley v. APAC, Inc.*, 236 F.3d 651, 655–56, 657 (11th Cir. 2000) (applying burden-shifting framework in *McDonnell Douglas* to ADA claim).

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* at 656. The employer must then offer a legitimate, nondiscriminatory reason for the employment decision to rebut the presumption. *Id.* If the employer successfully rebuts the presumption, plaintiff is given an opportunity to discredit the proffered nondiscriminatory reason by showing that it is merely a pretext for

---

[1] Disability discrimination claims under the FCRA are analyzed under the same framework as ADA claims. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005)). ADA claims are subject to the burden-shifting analysis of Title VII employment discrimination claims. *Id.* Thus, the burden-shifting framework discussed herein applies with equal force to Palermo's FCRA claims.

discrimination ("***McDonnell Douglas* Test**"). *See id.*

Reduction-in-force cases ("**RIF**") proved by circumstantial evidence are different. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). In such cases, the U.S. Court of Appeals for the Eleventh Circuit has adopted a variant of the *McDonnell Douglas* Test, which requires a plaintiff to establish that: (1) he was a member of a protected group and was adversely affected by an employment decision; (2) he was qualified for his own position or to assume another position at the time of the discharge; and (3) the employer intended to discriminate against him in making the discharge decision ("**RIF Test**"). *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *see also Taylor v. Teakdecking Sys., Inc.*, 571 F. App'x 767, 770 (11th Cir. 2014); *Brown v. Lassiter-Ware, Inc.*, No. 6:11-cv-1074-Orl-36DAB, 2013 WL 4456546, at *7 (M.D. Fla. Aug. 16, 2013).

### A.    Prima Facie Showing of Discrimination

The parties disagree about the analytical framework that the Court should apply to Palermo's initial burden. (*See* Doc. 50, pp. 7–8; *see also* Doc. 55, pp. 2–4.) Grunau contends that the RIF Test applies and that Palermo cannot show a critical factor of this test—that a nondisabled, similarly situated employee was treated more favorably than Palermo. (Doc. 50, pp. 7–8.)

Palermo counters that the *McDonnell Douglas* Test applies here because she was replaced by someone outside the protected class. (Doc. 55, p. 2.) According to Palermo, the record shows that Grunau hired Wells to replace Palermo while she was on medical

leave.[2] (*Id.* at 2–3.)

Contrary to the parties' positions, this Circuit does not require a plaintiff to prove he was *replaced* by a non-disabled person in order to establish a prima facie case concerning ADA claims. *See Knowles v. Sheriff*, 460 F. App'x 833, 835 (11th Cir. 2012) (requiring only that a plaintiff prove that he was "discriminated against because of his disability"); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case")*; Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000).[3] Indeed, a triable issue of fact exists if the record presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" by the employer. *Smith*, 644 F.3d at 1328. Palermo's action against Grunau emanates from her August 2011 termination and Grunau's subsequent failure to rehire her. (*See* Doc. 2, ¶ 28.) Accordingly, the Court will assess whether Plaintiff has made a prima facie showing of discrimination under the RIF Test.

The parties' dispute regarding the RIF Test concerns only the third prong—whether Grunau intended to discriminate against Palermo in making its discharge decision.

---

[2] Palermo submits that the decision in *Mazzeo v. Color Resolutions International, LLC*, 746 F.3d 1264, (11th Cir. 2014), leans in her favor on this point. The Court disagrees. *Mazzeo* involved an age discrimination claim where, after the plaintiff's termination, the employer filled plaintiff's former position with a younger employee. *Mazzeo*, 746 F.3d at 1267. The *Mazzeo* court recognized that "a plaintiff may demonstrate that he was replaced by showing that, *after his termination*, some of his former responsibilities were delegated to another employee." *Id.* at 1271 (emphasis added). However, at the time Palermo contends she was "replaced" by Wells, she had not yet been terminated. (Doc. 55, pp. 2–3.) This fact alone militates against employing Palermo's requested analysis.

[3] *See also Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966, 971 n.4 (11th Cir. 2008); *Holly*, 492 F.3d at 1255–56; *Rossbach v. City of Miami*, 371 F.3d 1354, 1356–57 (11th Cir. 2004).

(*See* Doc. 50, pp. 7–8; *see also* Doc. 55, p. 2.) Grunau contends that Palermo was not subjected to unlawful discrimination because her termination was due to a legitimate RIF. (Doc. 50, pp. 7–8.)

Viewing the evidence in the light most favorable to Palermo, the Court finds that she has presented a "convincing mosaic of circumstantial evidence" from which a jury could infer Grunau's intent to discriminate based on Palermo's disability. First, Cross's statements while Palermo was on medical leave are probative. (*See* Doc. 53-1.) According to Smith, on multiple occasions, Cross stated: (1) Palermo would never return to work because she would never get a complete doctor's release; (2) even if she did return, Palermo would have another stroke and have to go on leave again; and (3) Palermo could not drive because she might have another stroke. (*Id.*)

Additionally, after returning from medical leave, Grunau transferred Palermo to its Fort Myers office purportedly because it lacked sufficient work in Orlando. (Doc. 47-1, ¶ 15.) At this time, it was common knowledge that Grunau was considering closing the Fort Myers office and had already begun the process of laying off employees. (Doc. 53-1, ¶ 8; *see also* Doc. 47-1, p. 6.) Moreover, Smith declared that when Palermo returned, the Orlando office had a profusion of work. (*See* Doc. 53-1, ¶ 8.)

Finally, Grunau offered no explanation as to why out of the three Orlando-based Inspectors—Smith, Wells, and Palermo—it chose to transfer Palermo to Fort Myers. Standing alone, Grunau's business decisions with respect to its employees are inconsequential; however, the combination of the transfer, along with Cross's statements, is fatal at the summary judgment stage.

In light of the foregoing and, in particular, the timeline of events leading to

Palermo's termination, the Court finds that Palermo has established a prima facie case of discrimination. The Court's inquiry, however, is not terminated, as the burden now shifts to Grunau to present a legitimate, nondiscriminatory reason for Palermo's termination.

### B.    Legitimate, Non-Discriminatory Reason for Termination

The employer's burden is merely one of production, not persuasion. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (explaining that an employer's burden is met where it "raises a genuine issue of fact as to whether it discriminated against the plaintiff"); *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060–61 (11th Cir. 1994) (explaining that such burden is "exceedingly light").

To rebut Palermo's presumption, Grunau maintains that it terminated Palermo as part of a legitimate RIF that led not only to the termination of twenty-six other Fort Myers employees, but also to the closing of the Fort Myers office. (Doc. 50, p. 8.) Grunau's proffered reason satisfies its burden of production.

### C.    Evidence that Proffered Reason is Pretextual

Once an employer carries its burden of production, the presumption raised by the prima facie case is rebutted. *Burdine*, 450 U.S. at 255. A plaintiff then is afforded a "'full and fair opportunity to demonstrate' through presentation of his own case . . . 'that the proffered reason was not the true reason for the employment decision.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993) (quoting *Burdine*, 450 U.S. at 256). This burden merges with the ultimate burden of persuading the court that he has been victimized by intentional discrimination. *Burdine*, 450 U.S. at 256.

In this context, a plaintiff may succeed either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* However, it is not enough to simply *disbelieve* the employer's stated reason; rather, "the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 519 (emphasis in original); *see also Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1993) ("the ultimate question [is] discrimination *vel non*"); *McDonnell Douglas*, 411 U.S. at 805 (explaining that a plaintiff must demonstrate through competent evidence that the employer's stated reason was "in fact a cover up for" a discriminatory decision).

Grunau asserts that Palermo has not met her burden here because a RIF attributed to lack of work constitutes a legitimate nondiscriminatory reason for Palermo's termination. (Doc. 50, p. 9.) Palermo counters that the evidence establishes, at minimum, that issues of material fact exist as to whether Grunau's stated reason was pretextual. (Doc. 55, p. 5.) The Court agrees with Palermo.

Pretext is most readily inferred from Smith's declaration that, at the time Grunau transferred Palermo to the Fort Myers office, it was common knowledge that Grunau was considering closing the Fort Myers office. (Doc. 53-1, ¶ 8.) Nonetheless, upon Palermo's return from medical leave, Grunau maintained that the Fort Myers office had work available and that there was insufficient work in Orlando resulting from accelerated deadlines from Walgreens. (Doc. 47-1, ¶ 12; *see also* Doc. 54-1, p. 56.) Belying this position, Peters explained that any schedule changes would have come at the beginning of the year—months before Palermo went on medical leave. (Doc. 54-1, p. 57.) Additionally, Smith stated that: (1) she was not informed of any schedule changes

pertaining to Walgreens and continued to perform inspections for that customer until November 2011 (Doc. 53-1, ¶ 10); and (2) when Palermo returned from medical leave, the Orlando office had more than enough work, so much so that union construction inspectors assisted in covering Smith and Wells's workload (*Id.*, ¶ 8).

Grunau also offers no explanation as to why or how it made the choice to transfer Palermo, rather than Wells or Smith. This absence is especially compelling in light of Smith's previous request to perform work in Fort Myers. (*Id.*) Once Palermo began work in Fort Myers, Grunau maintains that it "unexpectedly learned that the workload in the Fort Myers office was about to significantly decrease as well." (Doc. 47-1, ¶ 19). Peters explained that the diminished workload in Fort Myers became apparent on August 8, 2011—the same day Palermo was terminated. (Doc. 54-1, p. 54.) In support, Grunau submits evidence of a list of twenty-seven employees, including Palermo, and their respective termination dates ("**Termination List**"). (Doc. 47-1, ¶ 20; *see also* Doc. 47-1, p. 6.) However, a review of the Termination List shows that of the twenty-seven Fort Myers employees terminated, twenty-two were let go before Palermo. (Doc. 47-1, p. 6.) Indeed, the earliest termination date on the Termination List extends back to September 2010. (*Id.*) Such a protracted RIF undercuts Grunau's position that the Fort Myers office experienced an unexpected decline in work. Rather, a reasonable factfinder could infer that Grunau's decision to transfer Palermo to an office that it knew to be closing was "a cover up" for intentional discrimination against Palermo because of her disability. This inference is strengthened by Grunau's failure to provide Palermo with a company vehicle after her return despite such provision prior to her stroke. (Doc. 49-1, p. 91; *see also* Doc. 53-1, ¶ 8.) As such, the Court finds that Grunau's Motion is due to be denied as to

Palermo's discrimination claims (Doc. 2, ¶¶ 22–44).

## II.   Retaliation Claim

A prima facie case of retaliation under the FCRA is established if a plaintiff shows that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.[4] *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008); *see also Olson v. Dex Imaging, Inc.*, 63 F. Supp. 3d 1353, 1362 (M.D. Fla. 2014). Retaliation in this context "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, an employee may succeed on his retaliation claim if "a reasonable employee would have found the challenged action materially adverse"—that is, that the challenged action would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68; *see also Jones v. Ala. Power Co.*, 282 F. App'x 780, 784–85 (11th Cir. 2008).

Generally, "it is for the jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse.'" *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008). A court may decide the issue as a matter of law if the challenged acts are trivial or do not produce injury or harm. *See White*, 548 U.S. at 67–68; *see also Williams v. Apalachee Ctr.*, 315 F. App'x 798, 800 (11th Cir. 2009) (affirming the lower court's grant of summary judgment in favor of the defendant employer because the plaintiff failed to create a genuine issue of material

---

[4] Retaliation claims under the FCRA are analyzed under the Title VII retaliation framework. *Sicilia v. United Parcel Serv., Inc.*, 279 F. App'x 936, 939 n. 6 (11th Cir. 2008) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

fact regarding whether he suffered a materially adverse employment action).

The parties agree that filing the ADA Charge constitutes statutorily protected activity. (Doc. 50, p. 10; Doc. 55, p. 9.) Nonetheless, Grunau represents that it is entitled to summary judgment because Palermo has failed to advance an adverse employment action. (Doc. 50 at 10–11.) Grunau contends that it made *no* hiring decisions, let alone an adverse one, for more than a year after Palermo filed her ADA Charge; thus, Palermo was treated in identical fashion to similarly situated applicants. (*Id.* at 11.) Grunau misconstrues Palermo's burden in this context, as there is no comparator requirement for a prima facie showing of retaliation. *See McCann*, 526 F.3d at 1375.

Contrary to Grunau's position, a failure to rehire is "undoubtedly an adverse employment action" where an employee reapplied for the position post termination. *See Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1135, 1141 (5th Cir. 1981).[5] Regardless of *when*, it is undisputed that Grunau did hire Inspectors after Palermo filed her ADA Charge. (*See* Doc. 50, pp. 4, 11.) Additionally, it is undisputed that Palermo did reapply for an Inspector vacancy. (*Id.*) Accordingly, the Court finds that Palermo has produced sufficient evidence of an adverse employment action.

As for the causal relationship, courts construe such element broadly so that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). The causation element is, thus, satisfied if a plaintiff provides evidence that the defendant

---

[5] The U.S. Court of Appeals for the Eleventh Circuit has adopted as binding precedent all decisions issued by the U.S. Court of Appeals for the Fifth Circuit prior to the close of business on October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

knew of the protected activity and that there was a close temporal proximity between the defendant's knowledge and the adverse action. *Id.* Notwithstanding this broad interpretation, "mere temporal proximity," without more, must be "very close" to establish causation. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (upholding the district court's grant of summary judgment on a retaliation claim because the adverse action taken twenty months later, by itself, suggested "no causality at all"). Where a plaintiff presents no other evidence as to causation and there is a substantial delay between the protected activity and the adverse action, the retaliation claim fails as a matter of law.[6] *Thomas v. Cooper Lighting, Inc.*, 506, F.3d 1361, 1364 (11th Cir. 2007) (upholding the district court's grant of summary judgment because the three-month period between the protected activity and the adverse action, without more, failed to raise a jury question).

Grunau asserts that even if there was an adverse employment action, Palermo has failed to establish the necessary causal link because: (1) the more-than-one-year temporal gap between Grunau's knowledge of the filing of the ADA Charge on October 4, 2011, and Grunau's alleged failure to rehire Palermo for an Orlando Inspector on

---

[6] *See also Bailey v. City of Huntsville*, 517 F. App'x 857, 861 (11th Cir. 2013) (affirming district court's grant of summary judgment on retaliation claim because the plaintiff adduced no other evidence of causation and, by itself, a five-month time lapse between the protected activity and the adverse action is "too long under [this Circuit's] precedent" to establish causality); *Higdon*, 393 F.3d 1220–21 (affirming the district court's grant of summary judgment on retaliation claim because, standing alone, a three-month period between the protected activity and the adverse action was insufficient to establish causality); *cf. Ames v. Verizon Data Servs., Inc.*, No. 8:07-cv-00698-T-24-TGW, 2008 WL 3927262, at *4 (M.D. Fla. Aug. 21, 2008) (denying employer's summary judgment as to a retaliation claim because the "the two-to-three month proximity" between the protected activity and the adverse action "suggests a causal relationship").

October 8, 2012 does not satisfy the "very close" temporal proximity requirement; and (2) Palermo's own testimony establishes that she believed she was not rehired because of her stroke, not because of the ADA Charge filed. (*See* Doc. 50, pp. 4, 12–13.)

For her part, Palermo posits that "the essence of a 'failure to rehire' claim" is the refusal to rehire an employee when a position is *available*. (Doc. 55, p. 10.) According to Palermo, the temporal gap is closed because the job vacancy became available in October of 2012, at which time Grunau should have considered Palermo for rehire but did not. (*Id.*)

The Court declines Palermo's invitation to view the lapse in time this way. Importantly, Palermo's claim is not for failure to rehire, but rather for *retaliation* based on Palermo's filing of the ADA Charge. (*See* Doc. 2, ¶¶ 46–50.) These two claims are distinct. *See Underwood v. Perry Cty. Comm'n*, 431 F.3d 788 (11th Cir. 2005) (describing the elements required to establish a failure-to-rehire claim); *see also King v. Cintas Corp.*, 920 F. Supp. 2d 1263, 1269 (N.D. Ala. 2013) (citing *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)) (noting the difference between failure-to-rehire claims and retaliation claims)).

Palermo is right that an adverse action did not occur until Grunau failed to rehire her when it had the opportunity to do so either in October of 2012.[7] It is then that Palermo had a basis from which to assess whether Grunau had retaliated against her for filing the ADA Charge. *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 765 (11th Cir. 1995)

---

[7] Even if the Court were to assess the temporal gap from the earlier hiring of an Inspector based in south Florida, the result would be the same. A ten-month gap between Grunau's knowledge of the filing of the ADA Charge on October 4, 2011 and its failure to rehire Palermo on August 15, 2012, by itself, is not close enough to satisfy the causality requirement.

(assessing the accrual of a retaliation claim in the context of whether a plaintiff had timely filed such claim with the EEOC). However, Palermo misapprehends the causality requirement. Her position bolsters, rather than refutes, the stretch of time between the relevant events.

In addition, Palermo asserts that she has satisfied the causality requirement because Grunau hired an Inspector only two weeks after the EEOC dismissed the ADA Charge. (Doc. 55, p. 11.) In reliance, Palermo cites *Olmsted v. Defosset*, 205 F. Supp. 2d 1316, 1321-22 (M.D. Fla. 2002), for the proposition that this wait-and-see approach establishes causality. In *Olmsted*, the court denied the defendant's motion to dismiss the plaintiff's retaliation claim because it found that the plaintiff had "alleged that he filed suit, and after the suit was dismissed, he attempted to look for a job, at which point [defendant] failed to rehire him." *Id.* at 1322. As to the temporal proximity requirement, the *Olmsted* court noted that "*sometime after* the [c]ourt's summary judgment in favor of [d]efendant" on plaintiff's discrimination claims, "plaintiff sought to be rehired." *Id.* at 1319 (emphasis added). Plaintiff suggests that *Olmsted* warrants a similar finding of causation here. (Doc. 55, p. 12.) The Court disagrees.

First, unlike here, the *Olmsted* court's standard of review was limited to the allegations in the complaint. 205 F. Supp. 2d at 1319. Second, the *Olmsted* court provided no specific time period between the protected activity and the adverse action. *Id.* Where, as here, Palermo seeks to establish causality based merely on temporal proximity between Grunau's knowledge of the protected activity and the adverse action, binding precedent requires Palermo to show a "very close" temporal proximity. Nothing in

*Olmsted* requires a different conclusion than the one reached here.[8]

As such, the Court finds, that, standing alone, the more-than-one-year temporal gap between Grunau's knowledge of the filing of the ADA Charge and Grunau's alleged failure to rehire Palermo is insufficient to create a factual issue for the jury as to causation. Therefore, Grunau's Motion is due to be granted as to Palermo's retaliation claim (Doc. 2, ¶¶ 46–51).

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.    Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 50) is **GRANTED IN PART AND DENIED IN PART**.

    a.    To the extent Defendant Grunau Company, Inc. seeks summary judgment as to Plaintiff Antonia Palermo's retaliation claim, the Motion is **GRANTED**.

    b.    In all other respects, the Motion is **DENIED**.

2.    The Clerk is **DIRECTED** to enter judgment in favor of Defendant Grunau Company, Inc. and against Plaintiff Antonia Palermo on Count IV of the Complaint. (Doc. 2, ¶¶ 46–51.)

3.    The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff and against Defendant on Counts I, II, and III of the Complaint. (Doc. 2, ¶¶ 22–44.)

**DONE AND ORDERED** in Chambers in Orlando, Florida, on November 4, 2016.

---

[8] Palermo supplements her causality argument by highlighting the absence of any explanation as to why Grunau did not rehire Palermo. (Doc. 55, p. 11.) However, this evidence does nothing to aid Palermo in her attempt to establish causation, as it does not show that Grunau's alleged failure to rehire Palermo was somehow related to the filing of the ADA Charge.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record